2013 COA 119

MID VALLEY REAL ESTATE SOLUTIONS V, LLC, a Colorado limited liability company, Plaintiff–Appellee,

v.

HEPWORTH–PAWLAK GEOTECHNICAL, INC., a Colorado corporation; Steve Pawlak; Daniel Hardin; and S K Peightal Engineers, Ltd., a Colorado corporation, Defendants–Appellants.

Court of Appeals No. 13CA0519

Colorado Court of Appeals,
Div. A.

Announced August 1, 2013

**988**

Garfield County District Court No. 11CV260, Honorable Denise K. Lynch, Judge

Garfield and Hecht, P.C., David L. Lenyo, Chad J. Schmidt, Avery A. Simpson, Aspen, Colorado, for Plaintiff–Appellee

Cardi, Schulte & Ford, LLC, Andrew S. Ford, Daniel V. Woodward, Greenwood Village, Colorado, for Defendants–Appellants Hepworth–Pawlak Geotechnical, Inc., Steve Pawlak, and Daniel Hardin

Montgomery Little & Soran, P.C., Echo D. Ryan, Shawn A. Eady, John R. Riley, Greenwood Village, Colorado, for Defendant–Appellant S K Peightal Engineers, Ltd.

Hogan Lovells U.S. LLP, Craig A. Umbaugh, David A. DeMarco, Denver, Colorado, for Amicus Curiae Colorado Bankers Association

Bieging Shapiro & Barber LLP, John E. Burrus, Tracy A. Davis, Denver, Colorado, for Amicus Curiae Independent Bankers of Colorado

Cardi, Schulte & Ford, LLC, Phillip B. Cardi, Greenwood Village, Colorado, for Amici Curiae American Council of Engineering Companies of Colorado, American Institute of Architects of Colorado, Structural Association of Colorado, and The Colorado Association of Geotechnical Engineers

Opinion by JUDGE WEBB

■ ¶ 1 A construction professional has an independent duty "to act without negligence in the construction of a home," and a "home owner" may sue in negligence for breach of this duty. *Cosmopolitan Homes, Inc. v. Weller*, 663 P.2d 1041, 1042–43 (Colo.1983). This interlocutory appeal under C.A.R. 4.2 presents a legal question unresolved in Colorado: whether "home owner" includes a wholly-owned subsidiary of the construction lender on the project, which holds title to the home solely for purposes of resale? We conclude that it does.[1]

¶ 2 Defendants, Hepworth–Pawlak Geotechnical, Inc., Steve Pawlak, and Daniel E. Hardin (collectively H–P), the project soils engineer; and S K Peightal Engineers, LTD (SKPE), the project structural engineer, challenge an order denying their motion for summary judgment on the negligence claim of plaintiff, Mid Valley Real Estate Solutions V, LLC (Mid Valley), a wholly-owned subsidiary of Alpine Bank (bank), the construction lender. Defendants contend that summary judgment should have been entered because the economic loss rule precludes this negligence claim, which was based on extensive damage to the house caused by soil expansion.

¶ 3 We conclude that the independent duty announced in Cosmopolitan Homes and reaf-

---

1. The trial court certified the following question: "whether a construction professional providing work on a residential house owes a common law tort duty of care to commercial entities [that] hold title to the property as part of a commercial transaction."

firmed in *A.C. Excavating v. Yacht Club II Homeowners Ass'n*, 114 P.3d 862 (Colo.2005), applies to defendants as residential construction professionals, and that Mid Valley's relationship to the construction lender does not take it outside the scope of this duty. Therefore, we affirm the trial court's denial of summary judgment because the existence of this duty renders the economic loss rule inapplicable, and we remand for further proceedings.

## I. Facts

¶ 4 The relevant facts are undisputed for purposes of this appeal. A developer entered into a written contract with H–P to analyze the soil on which houses would be built for resale. As required under the contract, H–P produced a report, which recommended a particular type of foundation. The developer's general contractor entered into an oral contract with SKPE to provide structural engineering services, including foundation design. The general contractor built the house at issue according to H–P's recommendations and SKPE's designs.

¶ 5 After completing the house, the developer was unable to sell it and eventually defaulted on the construction loan agreement with the bank. To avoid foreclosure, the developer and the bank entered into a deed-in-lieu agreement. Under this agreement, the bank received $355,000, and title to the house was transferred to Mid Valley, which had been created to hold the house, its sole asset, for resale. In return, the bank forgave the remaining balance on the construction loan.

¶ 6 Soon after Mid Valley took title to the house, significant structural damage began to appear, starting with cracks in the foundation. As relevant here, Mid Valley sued defendants for negligence in failing to identify expansive soils and specify an appropriate foundation. Mid Valley sought damages for costs of repair.

## II. Law

¶ 7 Tort and contract law are distinct, each imposing different obligations: while tort duties are imposed by law to protect against "physical harm or damage to ... personal property," among other injuries, contractual duties arise solely from voluntary promises between parties. *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo.2004); *see City of Westminster v. Centric–Jones Constructors*, 100 P.3d 472, 483 (Colo.App.2003) ("Tort duties are imposed by law without regard to any agreement."). To maintain this distinction, the Colorado Supreme Court adopted the economic loss rule in *Town of Alma v. AZCO Construction, Inc.*, 10 P.3d 1256, 1264 (Colo.2000) ("[A] party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law.").

¶ 8 Whether the economic loss rule applies in a particular case turns on the source of the duty at issue. *Id.* at 1262; *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 291 (Colo.App.2009). Generally, if either the duty was created by contract or the applicable tort duty would duplicate "a duty also imposed by the contract," then the duty is not "independent" and the economic loss rule applies. *Makoto USA, Inc. v. Russell*, 250 P.3d 625, 627 (Colo. App.2009); *accord Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1269–70 (Colo.2000).

¶ 9 This source of duty inquiry is illustrated by *BRW*, which turned on a series of contracts involving multiple parties on a commercial construction project. The supreme court held that the economic loss rule precluded a subcontractor's negligence suit against an engineer and the project supervisor because "the duties allegedly breached were contained in the network of interrelated contracts." *BRW*, 99 P.3d at 74. The court compared the defendants' contractual duties and remedies to those in negligence and concluded that "[t]he interrelated contracts ... contain[ed the defendants'] duty of care, and [plaintiff's] remedies exist[ed] in contract." *Id.* Thus, the economic loss rule applied and precluded the subcontractor's claims. *Id.*

¶ 10 But less than a year later, in *A.C. Excavating*, 114 P.3d at 866, the supreme court reiterated that "the economic loss rule ha[s] no application" when the applicable

duty is necessarily "independent of any contractual obligations that may have existed." The case arose from construction defects in a townhome project. Without mentioning the test announced in *BRW*—whether the parties' contracts provided a standard of care, and if so, whether that standard duplicated the applicable negligence duty—the court noted that "*Cosmopolitan Homes* specifically held that builders have an independent duty of care to act without negligence in the construction of homes" and allowed a negligence action to proceed against subcontractors. *Id.* at 867.

¶ 11 This independent duty was first recognized in *Cosmopolitan Homes*, 663 P.2d at 1042, which involved a negligence action by a home owner against a builder. The supreme court noted that the contract and negligence claims were distinguishable "and therefore they should be treated differently." *Id.* at 1045. The court held that "[a]n obligation to act without negligence in the construction of a home is independent of contractual obligations." *Id.* at 1042.

¶ 12 Although *Cosmopolitan Homes* predates the supreme court's adoption of the economic loss rule, "*Town of Alma* firmly establish[ed] that the economic loss rule does not apply to negligent construction claims against homebuilders because homebuilders have an independent duty of care to act without negligence in the construction of homes." *A.C. Excavating*, 114 P.3d at 867. And rather than limiting this duty, the supreme court expanded it beyond "builders" to include residential subcontractors. *Id.* at 868.

¶ 13 Colorado appellate courts have predicated this independent duty on the following policy considerations:

- Preventing "overreaching" by a builder, which is "comparatively more knowledgeable" and "is in a far better position to determine the structural condition of a house than most buyers," *Cosmopolitan Homes*, 663 P.2d at 1045 (quotations omitted);
- An "ordinary purchaser of a home is not qualified to determine when or where a defect exists," *id.* (quotations omitted);

- A purchaser of a home "rarely has access to make any inspection of the underlying structural work, as distinguished from the merely cosmetic features," *id.* (quotations omitted);
- The magnitude of the investment made when purchasing a home, *id.*;
- The foreseeability that a house will be sold to someone who is not the original owner, *id.*;
- The foreseeability that a construction professional's work on a house "is, ultimately, for the benefit of home[ ]owners and that harm to home[ ]owners from negligent construction is foreseeable," *Yacht Club II Homeowners Ass'n v. A.C. Excavating*, 94 P.3d 1177, 1181 (Colo. App.2003), *aff'd*, 114 P.3d 862 (Colo. 2005); and
- An independent duty "discourage[s] misconduct and provide[s] an incentive for avoiding preventable harm," *id.*

¶ 14 In sum, "the issue of duty in the context of the economic[ ]loss rule differs depending upon whether one is evaluating the standard of care owed by commercial contractors or residential contractors." 7 Colo. Prac., *Personal Injury Torts And Insurance* § 10:40 (3d ed.). Thus, while application of the economic loss rule in commercial construction cases hinges on the "contractual context among and between the parties," *BRW*, 99 P.3d at 74, our supreme court continues to recognize an "independent duty of care" in residential construction. *A.C. Excavating*, 114 P.3d at 866. As a result, "the economic loss rule has no application" to negligence that produces latent defects in residential construction "and does not bar a plaintiff's tort claim." *Id.*

### III. Application

#### A. Standard of Review

¶ 15 "The question whether the district court correctly applied the economic loss rule is one of law...." *Jorgensen v. Colo. Rural Properties, LLC*, 226 P.3d 1255, 1258 (Colo.App.2010). Application of law to undisputed facts is reviewed de novo, *Schuessler v. Wolter*, 2012 COA 86, ¶ 105, 310 P.3d 151, as is a trial court's summary judgment ruling.

*Shaw Constr., LLC v. United Builder Servs., Inc.*, 2012 COA 24, ¶ 13, 296 P.3d 145.[2]

## B. Analysis

¶ 16 Whether Mid Valley falls within the class of plaintiffs who may enforce defendants' independent duty under *Cosmopolitan Homes* and *A.C. Excavating* depends on whether that duty, which arises from the services provided in constructing a home, is limited by particular characteristics of the party holding title when the latent defect ripens. We conclude that neither tort law in general nor *Cosmopolitan Homes* and *A.C. Excavating* in particular limit the duty of residential construction professionals based on whether the plaintiff who seeks damages to cure a latent defect is a traditional home owner—a natural person who occupies the premises. Rather, because that duty arises from the services provided and the residential nature of the project, the particular attributes of the owner harmed when the latent defect ripens do not limit the scope of the duty.

¶ 17 While Mid Valley is not a traditional home owner, it took title to a completed house from the original owner. Allowing defendants to avoid liability merely because Mid Valley is not a traditional home owner would afford defendants a windfall resulting solely from the fortuity that the latent defect caused damage before Mid Valley could sell the house. Thus, we conclude that the scope of defendants' duty is not limited based on Mid Valley's relationship with the bank, lack of occupancy, or status as a commercial entity holding title only for purposes of resale. We address these considerations separately as follows.

### 1. Mid Valley's Relationship to the Bank Does Not Make the Bank a De Facto Plaintiff

¶ 18 Initially, we reject defendants' contention that because Mid Valley is a whol-ly-owned, single-asset subsidiary of the bank, created only to hold the house for resale, we should treat the bank as the de facto plaintiff. Doing otherwise, defendants argue, would allow the bank to skirt the economic loss rule "due solely to the fact that [the bank] was sophisticated enough in its dealings to create a subsidiary...." This argument is unpersuasive, for the following reasons.

¶ 19 The parties agree that Mid Valley is a legal entity separate from the bank, albeit its wholly-owned subsidiary. But "[o]nly extraordinary circumstances justify disregarding the corporate entity...." *McCallum Family L.L.C. v. Winger*, 221 P.3d 69, 74 (Colo.App.2009). And merely showing that one corporation "owns and controls" the other is insufficient to disregard the corporate entity. *Jarnagin v. Busby, Inc.*, 867 P.2d 63, 69 (Colo.App.1993).

¶ 20 Rather, courts must perform a fact-specific inquiry into a variety of factors, including:

(1) The parent corporation owns all or [a] majority of the capital stock of the subsidiary. (2) The parent and subsidiary corporations have common directors or officers. (3) The parent corporation finances the subsidiary. (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. (5) The subsidiary has grossly inadequate capital. (6) The parent corporation pays the salaries or expenses or losses of the subsidiary. (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. (8) In the papers of the parent corporation, and in the statements of its offi-

---

2. While denial of summary judgment is usually not appealable, *Moss v. Members of Colorado Wildlife Com'n*, 250 P.3d 739, 742 (Colo.App. 2010), we may review non-final orders "where specifically authorized by statute or rule." *J.P. Meyer Trucking & Const., Inc. v. Colorado Sch. Districts Self Ins. Pool*, 18 P.3d 198, 201 (Colo. 2001). And C.A.R. 4.2 grants to divisions of this court the discretion to review interlocutory or-ders when: "(1) immediate review may promote a more orderly disposition or establish a final disposition of the litigation, (2) the order from which an appeal is sought involves a controlling question of law, and (3) the order from which an appeal is sought involves an unresolved question of law." *Wahrman v. Golden W. Realty, Inc.*, 313 P.3d. 687, 688, (Colo.App.2011).

cers, 'the subsidiary' is referred to as such or as a department or division. (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

*Great Neck Plaza, L.P. v. Le Peep Rests., LLC*, 37 P.3d 485, 490 (Colo.App.2001).

¶ 21 Here, on summary judgment, the trial court made no findings relevant to these factors. Defendants cite no Colorado authority, nor are we aware of any, explaining how we could resolve such a fact-intensive inquiry for the first time on appeal. And in any event, doing so would be inappropriate because in reviewing summary judgment, the nonmoving party "must receive the benefit of all favorable inferences that may be reasonably drawn from the undisputed facts." *Mancuso v. United Bank of Pueblo*, 818 P.2d 732, 736 (Colo.1991) (quotations and citations omitted). Because treating the bank as the de facto plaintiff could weaken Mid Valley's position on the economic loss rule, we cannot assume that Mid Valley is the bank's alter ego for purposes of summary judgment.

¶ 22 Also, defendants point to no record evidence, other than Mid Valley's wholly-owned subsidiary status, showing that refusing to disregard the corporate entity would lead to an inequitable result under the circumstances. *See Great Neck Plaza*, 37 P.3d at 490 (disregarding the corporate entity "requir[es] balancing of the equities in each particular case"). And "[i]n the absence of a fully developed factual record and adequate findings of fact ... we cannot determine whether th[e] equitable doctrine [of disregarding the corporate entity] should be applied here." *Micciche v. Billings*, 727 P.2d 367, 373 (Colo.1986).

¶ 23 Therefore, we decline to treat the bank as the de facto plaintiff. Having so concluded, we also decline to address defendants' arguments for applying the interrelat-

ed contract doctrine to the bank's rights under the construction loan agreement with the developer.[3]

2. **The Independent Duty of Residential Construction Professionals Can Be Enforced by Any Transferee of a House Who is in Title When the Latent Defect Causes Damage**

¶ 24 Defendants argue that the duty of residential construction professionals to act with reasonable care should be limited based on characteristics of the plaintiff. This argument fails because duty analysis deals with classes of plaintiffs, not attributes of an individual plaintiff, and because our supreme court formulated this duty without any limitation based on particular attributes of the plaintiff, beyond requiring that the plaintiff be a transferee from the original owner, have owned the house in question when the latent defect caused damage, and have suffered harm as a result. Therefore, we decline to impose any other limitation on the class of plaintiffs to whom the duty is owed.

a. Duty Analysis Looks at the Class of Plaintiffs to Whom a Duty Is Owed

¶ 25 "Whether the defendant owed a duty *to the class* in which the plaintiff found [it]self is a question of law for the court based on the foreseeable appreciable risk of harm." *Lannon v. Taco Bell, Inc.*, 708 P.2d 1370, 1373 (Colo.App.1985) (emphasis added), *aff'd*, 744 P.2d 43 (Colo.1987). If "the category of negligent *conduct* at issue is sufficiently likely to result in the *kind of harm* experienced[,] ... liability may appropriately be imposed on the negligent party." *Ballard v. Uribe*, 41 Cal.3d 564, 224 Cal.Rptr. 664, 715 P.2d 624, 648 n. 6 (1986) (emphasis added), *cited with approval in Groh v. Westin Operator, LLC*, 2013 COA 39, ¶ 33, —— P.3d ——, 2013 WL 3989289; *see also White v. Pines Enters., Inc.*, 728 P.2d 759, 761 (Colo. App.1986) ("[L]andscaper ... owed a general duty of care *to all persons* who might reasonably be foreseen to incur physical injuries as

---

3. The bank's rights under the construction loan agreement included: approval of all subcontractors; acceptance of the plans and specifications; receipt of satisfactory soils reports; and inspec-

tion "at any reasonable time." However, we express no opinion on application of the economic loss rule had the bank taken title under the deed-in-lieu agreement and brought this action.

a result of such conduct." (emphasis added)); *cf. Montoya v. Connolly's Towing, Inc.,* 216 P.3d 98, 105 (Colo.App.2008) (recognizing "a risk that *either friends and family members* using its storage lot or third parties could be injured" (emphasis added)).[4]

¶ 26 Here, Mid Valley falls within the class—subsequent transferees of houses bearing latent defects—foreseeably harmed by negligent construction that created such defects. *See Cosmopolitan Homes,* 663 P.2d at 1045 ("[I]t is foreseeable that a house will be sold to subsequent purchasers, and any structural defects are as certain to harm the subsequent purchaser as the first."). If any of Mid Valley's specific circumstances could limit defendants' liability, this is a question of proximate cause for the jury, not the scope of the duty. *See* Dan B. Dobbs, *The Law of Torts* § 182, at 450 (2000) ("[While] duty rules are classically categorical and abstract[,] . . . cover[ing] a class or category of cases . . . . proximate cause decisions are quite fact-specific."); *see also Hayes v. Williams,* 17 Colo. 465, 473, 30 P. 352, 355 (1892) (noting that proximate cause is determined by the "associated facts and circumstances" of the case).

### b. *Cosmopolitan Homes* and *A.C. Excavating* Do Not Support Limiting the Class of Plaintiffs

¶ 27 *Cosmopolitan Homes,* 663 P.2d at 1042, discusses a residential builder's duty of care in terms of a "subsequent home owner['s ability] to maintain an action against a builder for negligence," but does not define "home owner." Nor has any other reported Colorado case done so.

¶ 28 According to *Black's Law Dictionary,* 1214 (9th ed. 2009), an "owner" is someone "who has the right to possess, use, and convey something; a person in whom one or more interests are vested." And a "home" is "a dwelling place." *Id.* at 801; *see People v.*

*Holwuttle,* 155 P.3d 447, 450 (Colo.App.2006) (describing *Black's Law Dictionary* as a source of "the most widely accepted legal meaning" of undefined terms).

¶ 29 Neither of these definitions suggests narrowing the scope of "home owner" based on any particular attribute of the plaintiff. Rather, they encompass any entity or person that has vested property rights in a dwelling place.

¶ 30 The supreme court's reasoning in *Cosmopolitan Homes* supports this broad interpretation of "home owner." The court used "home owner" and "purchaser" interchangeably throughout the opinion. *See, e.g.,* 663 P.2d at 1045 ("Moreover, given the mobility of most potential home owners, it is foreseeable that a house will be sold to subsequent purchasers, and any structural defects are as certain to harm the subsequent purchaser as the first. We see no reason for disallowing a subsequent purchaser to state a claim in negligence." (citations omitted)).

¶ 31 But the term "purchaser" does not distinguish between natural persons and commercial entities. Nor does the act of purchasing limit the purchaser's intended use of the home. A purchaser could acquire a home as a secondary residence, to hold as an investment, to rent, or to remodel and resell.

¶ 32 In *A.C. Excavating,* 114 P.3d at 867, the supreme court explained, "*Cosmopolitan Homes* specifically held that builders have an independent duty of care to act without negligence in the construction of homes." The court reaffirmed the "holding in *Cosmopolitan Homes* permitting residential property owners to bring negligent construction claims against builders generally." *Id.* at 869. It relied in part on the Construction Defect Action Reform Act, which defines a claimant broadly as someone "who asserts a claim against a construction professional that alleges a defect in the construction of an improve-

---

**4.** For example, in *Groh v. Westin Operator, LLC,* ¶ 34, the majority concluded that the plaintiff, an intoxicated guest who had been evicted from the defendant hotel and therefore was injured in an automobile accident, was "a member of a class—intoxicated guests—to whom harm from eviction was reasonably foreseeable." Rejecting the hotel's argument that the accident was too attenuat-

ed from the eviction, the division held that summary judgment was inappropriate. It explained, "if a court finds a duty and a trier of fact concludes that a defendant breached this duty by failing to act according to the standard of conduct, the particular risk that ripens presents only an issue of proximate cause." *Id.* at ¶ 36.

ment to real property." § 13–20–802.5(3), C.R.S.2012.

¶ 33 Nowhere does this duty formulation suggest that the scope of a residential builder's liability should be limited based on particular characteristics of the owner, despite having arisen from the foreseeable consequences of latent defects caused by defective workmanship. In addition, *A.C. Excavating*, 114 P.3d at 868, "did not attempt to describe the relationship" between plaintiffs and defendants, but rather "simply found that the duty was to be borne by all 'builders.'"

¶ 34 Further, the court clarified that the term "builder," as used in *Cosmopolitan Homes*, "suggests that [the independent] duty is broadly shared by builders in general, not limited to the exclusion of subcontractors." *A.C. Excavating*, 114 P.3d at 868; *see also Park Rise Homeowners Ass'n v. Res. Constr. Co.*, 155 P.3d 427, 430 (Colo.App. 2006) (noting that *A.C. Excavating* uses "expansive language" when discussing negligence duty). Broadening the class of defendants who bear this duty weighs against narrowing the class of owners who can enforce it.

¶ 35 The factors announced in *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 46 (Colo.1987), as applied in *A.C. Excavating*, also weigh against narrowing the class of owners. The court evaluated "the foreseeability and likelihood of injury as weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the defendant," before concluding that "subcontractors and other builders are under an independent tort duty to act without negligence in the construction of homes." *A.C. Excavating*, 114 P.3d at 868. Because these factors focus on the conduct and identity of the defendant rather than on the characteristics of the plaintiff, they do not support excluding nontraditional home owners from the class of potential plaintiffs.

¶ 36 Additionally, our supreme court has not provided any guidance in parsing the wide spectrum of owners in the class of potential plaintiffs in residential construction cases. *Cf. Liebelt v. Bob Penkhus Volvo–Mazda, Inc.*, 961 P.2d 1147, 1149 (Colo.App.

1998) (an "intermediate appellate court may not exercise the raw judicial power necessary to create a new duty where the supreme court has established and never revoked contrary legal principles") (citing *Bernard Johnson, Inc. v. Cont'l Constructors, Inc.*, 630 S.W.2d 365 (Tex.App.1982)). And such parsing is especially problematic in the realm of duty, which uses "relatively bright lines, [which] are of general application...." *Raleigh v. Performance Plumbing & Heating, Inc.*, 130 P.3d 1011, 1021 (Colo.2006) (Mullarkey, C.J., concurring in part and dissenting in part) (quoting Restatement (Third) of Torts § 29 cmt. e (2010)).

¶ 37 Therefore, like in *Cosmopolitan Homes*, 663 P.2d at 1045, we "see no reason" that "a subsequent purchaser" should be prevented from suing under negligence. Accordingly, we do not read *Cosmopolitan Homes* or *A.C. Excavating* as limiting the scope of the duty of residential construction professionals based on any particular characteristics of the plaintiff, other than ownership at the time the latent defect causes injury.

### 3. Neither *Cosmopolitan Homes* nor *A.C. Excavating* Supports the Duty Limitations Urged by Defendants

¶ 38 Defendants argue that the independent duty does not extend to Mid Valley because it does not "reside" in the home, and because it is a commercial entity, which acquired the home solely as an asset for resale. *Cosmopolitan Homes* and *A.C. Excavating* do not support these limitations on the scope of defendants' duty.

#### a. Occupancy

An occupancy limitation is unworkable for three reasons.

¶ 39 First, the court's analysis in *Cosmopolitan Homes* undercuts an occupancy limitation on duty. As discussed above, the opinion does not refer to occupants but rather to "home owners" and "purchasers." And while a purchaser necessarily becomes a home owner, the purchaser need not become an occupant. Nor does an occupancy limitation present a bright-line test. For example, a purchaser may acquire a second home and

occupy it only for certain parts of the year, such as holidays or vacations. Defendants do not provide, nor can we discern, how to apply an occupancy limitation in these circumstances.

¶ 40 Second, this limitation could erode the purpose of *Cosmopolitan Homes* to allow subsequent purchasers of homes to bring negligence claims. For example, an occupancy limitation would preclude claims by foreclosing mortgage lenders, rental home owners, or owners who acquired the home for remodeling and resale. This result is illogical because such owners purchased the homes but could not recover for damages suffered when a latent defect ripened.

¶ 41 Third, as more fully discussed in subsection 4 below, limiting claimants to occupants would frustrate the goal of "discourag[ing] misconduct and provid[ing] an incentive for avoiding preventable harm." *Yacht Club,* 94 P.3d at 1181.

### b. Commercial Owner/Purpose

¶ 42 Initially, because only a natural person can occupy a residence, this limitation overlaps the proposed occupancy limitation. Hence, the commercial owner/purpose limitation suffers from the same failings discussed above.

¶ 43 Additionally, considering this limitation independent of the occupancy limitation would produce arbitrary results. For example, both a natural person and a commercial entity could acquire a house for rental or to remodel for resale, and both would suffer the same economic injury when a latent defect ripened. But defendants' proposed limitation would allow only the natural person to recover tort damages from the injury.

¶ 44 The plaintiffs in *Cosmopolitan Homes* were natural persons. The plaintiff in *A.C. Excavating* was a home owner's association bringing a statutory derivative action under the Colorado Common Interest Ownership Act.[5] The opinion does not address whether all of the owners represented were also natu-ral persons. Yet, neither case so limits its holding.

¶ 45 Rather than limiting its reasoning to noncommercial property owners, as defendants suggest, *Cosmopolitan Homes,* 663 P.2d at 1045, extends a builder's duty to all "foreseeable users of the property." *A.C. Excavating* does not contain contrary language. We have already discussed the foreseeability of Mid Valley's ownership. *See* Part III.B.2. And to the extent that "user" limits this foreseeability, it does not limit it as defendants suggest. Several "uses" for homes exist that are both foreseeable and commercial in nature, such as renting a house for profit or purchasing a house for renovation and resale. *Cf. Jackson & Co. (USA), Inc. v. Town of Avon,* 166 P.3d 297, 300 (Colo.App.2007) (referring to "short-term rental[ ]" as a "use of the duplex" at issue in the case).

¶ 46 Further, some of the policy factors discussed in *Cosmopolitan Homes,* 663 P.2d at 1045, weigh against a commercial owner/purpose limitation. Defendants rightly note that unlike a traditional home owner, a commercial entity does not "make[ ] the biggest and most important investment in his or her life" when purchasing a home. And while the budgets of many such entities are not so limited as that of many traditional home owners, *id.* a commercial owner's investment is no less worthy of protection than that of a noncommercial owner.

¶ 47 Nevertheless, including commercial owners in the class of potential plaintiffs is consistent with the policy of preventing "overreaching" by a builder, who "is in a far better position to determine the structural condition of a house than most buyers." *Id.* at 1045. An owner's commercial status and purpose do not guarantee insight into structural conditions that would conceal latent defects. Nor will such owners necessarily have "access to make any inspection of the underlying structural work, as distinguished from the merely cosmetic features." *Id.* (citation omitted).[6] And like the pro-

**5.** *See* § 38–33.3–302 (1)(d), C.R.S.2012 (permitting homeowners associations to "[i]nstitute, defend, or intervene in litigation or administrative proceedings in its own name on behalf of itself or two or more unit owners on matters affecting the common interest community").

**6.** For example, a foreclosing mortgage lender's knowledge of the encumbered property may be

posed occupancy limitation, a commercial owner/purpose limitation would both erode the objective of protecting subsequent purchasers and hamper the goal of discouraging defective construction.

#### 4. Defendants' Proposed Limitations Would Grant Them a Windfall

¶ 48 Finally, both of defendants' proposed limitations on the class of plaintiffs would allow them to avoid liability solely through the fortuity of who owned the house when the latent defect ripened. For example, as years pass, some houses will be foreclosed on by mortgage lenders, who, in turn, will sell the houses to new owners. If only natural persons who both owned and occupied such a house could enforce the builder's duty, the dispositive factor would be the fortuity of who owned the house when the defect ripened, rather than the builder's negligence and its consequences to that owner. This approach, in turn, would lead to the anomaly of a negligence duty becoming unenforceable upon sale of a home to a commercial or non-occupant owner, only to have enforceability resurrected upon acquisition by a traditional home owner.[7]

¶ 49 Nor would such limitations have any risk-avoidance value to a residential construction professional. On the one hand, such a professional would be motivated to build with care, because the vast majority of houses will be owner-occupied by natural persons. On the other hand, the resources allocated to building with care could not be reduced based on the limitations that defendants advance, as predicting when a non-occupying or commercial owner might acquire title, for how long, and the likelihood of a latent defect ripening during that time, is impossible.

¶ 50 Colorado courts "strongly endors[e] a policy favoring quality construction of homes" in order "[t]o discourage misconduct

and provide an incentive for avoiding preventable harm." *Yacht Club*, 94 P.3d at 1181. Allowing a defendant's liability to depend not on the defendant's blameworthiness and its consequences, but on the fortuity of who owned the home when the defect manifests itself, runs contrary to this policy. Because "any structural defects are as certain to harm the subsequent purchaser as the first," *Cosmopolitan Homes*, 663 P.2d at 1045, the mere fortuity of an owner who does not occupy the home or is a commercial entity would be an unprincipled reason to limit a defendant's liability. *Cf. Tanner v. Lambert Auto Elec. Co.*, 522 P.2d 130, 131 (Colo.App.1974) (not published pursuant to C.A.R. 35(f)) (noting that a plaintiff's ability to collect damages against a corporation whose employee injured the plaintiff should not "depend upon [a] fortuitous circumstance").

¶ 51 We do not consider defendants' duty "on a clean slate," *Justus v. State*, 2012 COA 169, ¶ 44, 337 P.3d 1219, but rather in the context of long-standing and recently reaffirmed supreme court precedent. Limiting the broad scope of the independent duty rule announced in *Cosmopolitan Homes* and *A.C. Excavating*, as defendants urge, would invite fine, ad-hoc distinctions unsupported by either case. *Cf. DCB Constr. Co. v. Cent. City Dev. Co.*, 965 P.2d 115, 120 (Colo.1998) ("[T]he law must be sufficiently predictable so that the appropriate parties can adequately calculate and make adjustments for the risks they face."). Thus, "absent some clear indication" from the supreme court, *Silver v. Colo. Cas. Ins. Co.*, 219 P.3d 324, 330 (Colo. App.2009), we decline to limit the independent duty as defendants request.

### IV. Conclusion

¶ 52 Because defendants owed Mid Valley an independent duty of care, the economic

---

limited to its appraised value.

**7.** *Cf. Sumitomo Bank v. Taurus Developers, Inc.*, 185 Cal.App.3d 211, 225–26, 229 Cal.Rptr. 719 (1986) ("Here, the fact it is the [commercial] lender who purchases and not a third party, is fortuitous. Liability for negligence should not depend upon the randomness in selection of the party who purchases an item when placed in the market. Nor do we divine any difference as to the foreseeability of harm to a purchaser of an item constructed for the purpose of being marketed to the public merely because the insolvency or default of the builder/debtor causes the product to be marketed through a trustee sale where the lender may be forced to purchase.").

loss rule does not preclude its negligence claim. Accordingly, we affirm the trial court's order denying summary judgment, and we remand for further proceedings consistent with this opinion.

JUDGE GABRIEL concurs.

JUDGE J. JONES specially concurs.

JUDGE J. JONES specially concurring.

¶ 53 I agree with the result reached by the majority, and with much of its analysis. In my view, the conclusion that defendants owed an independent duty to Mid Valley to act without negligence in the construction of the home is compelled (at least in this court) by the supreme court's decisions in *Cosmopolitan Homes, Inc. v. Weller*, 663 P.2d 1041 (Colo.1983), and *A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.*, 114 P.3d 862 (Colo.2005).

¶ 54 This is so for these reasons:

- Mid Valley is a "home owner" and "foreseeable user" of the home. *See Cosmopolitan Homes*, 663 P.2d at 1045; *id.* at 1044 ("The apparent risk encompasses one who foreseeably suffers personal injury as a consequence of builder or contractor negligence."); *see also A.C. Excavating*, 114 P.3d at 869 ("*Cosmopolitan Homes* permit[s] residential property owners to bring negligent construction claims against builders generally."). None of the bases for distinguishing Mid Valley from the typical homeowner posited by defendants strike me as workable or consistent with the supreme court's discussions in *Cosmopolitan Homes* and *A.C. Excavating*.

- Many, though perhaps not all, of the policy concerns given by the supreme court as supporting the independent duty rule in this context apply to Mid Valley.

- As the majority points out in Part III.B.4 of its analysis, distinguishing among types of homeowners could lead to anomalous results.

¶ 55 Thus, I perceive no principled basis for distinguishing *Cosmopolitan Homes*, a decision reaffirmed in *A.C. Excavating*, from this case. We are, of course, bound by those decisions. *Justus v. State*, 2012 COA 169, ¶ 44 (Court of Appeals is bound by decisions of the Colorado Supreme Court).

¶ 56 However, it does not appear to me that the holding of *Cosmopolitan Homes* is compatible with the economic loss rule, as articulated and explained by subsequent supreme court cases.

¶ 57 If a duty arises from or is encompassed by a contract, that duty cannot serve as the basis of a tort claim seeking only recovery for economic losses. *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 68, 71–74 (Colo.2004); *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1262 (Colo.2000). It is only when the duty is truly independent of the contract that such a tort claim is viable. *Town of Alma*, 10 P.3d at 1262. Thus, the ultimate question in this context is: What is the source of the duty? *Id.*

¶ 58 In *Town of Alma*, the court distinguished *Cosmopolitan Homes* on the basis the negligence claim in the latter case purportedly arose from a breach of a duty that was independent of the contract. *Id.* at 1265–66 (in *Cosmopolitan Homes* "we determined that a builder has an independent duty to act without negligence in the construction of a home") (citing *Cosmopolitan Homes*, 663 P.2d at 1042); *see also A.C. Excavating*, 114 P.3d at 866. But a close examination of the rationale of *Cosmopolitan Homes* shows that the duty recognized in that case is not "independent" of the contract in the manner contemplated by the economic loss rule. The majority in *Cosmopolitan Homes* based its decision to allow a negligence claim against the builder, in large part, on the following reasoning.

> [T]he 'contractual obligation is not the touchstone of civil liability in tort. It is only the matrix from which an independent obligation may arise.' ...*A contractual obligation gives rise to* a common law duty to perform the work subject to the contract with reasonable care and skill.... The fact that a contract may have existed between a builder and the original purchaser of the home does not transform the builder's contractual obligation into the measure of its tort liability *arising out of its contractual performance.*

*Cosmopolitan Homes*, 663 P.2d at 1043 (citations omitted; emphasis added). Thus, the court recognized the source of the tort duty as the contract itself. Under BRW and other subsequent supreme court decisions, any such duty is not independent of the contract and, hence, cannot provide the basis of a tort claim. *See A.C. Excavating*, 114 P.3d at 871 (Kourlis, J., dissenting) (opining that Cosmopolitan Homes is "inconsistent with the development of the law in this court"); *see also Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 248 (Utah 2009) (characterizing Town of Alma's attempt to reconcile Cosmopolitan Homes with the economic loss rule as "more a result of post hoc rationalization to save precedent than anything else" and holding there is no independent duty to construct a home without negligence).

¶ 59 [8]To be sure, the majority in *Cosmopolitan Homes* articulated a number of policy concerns justifying a rule allowing a homeowner to sue a builder for negligent construction. It seems to me, however, that while such concerns may justify recognition of a de jure exception to the economic loss rule (a matter on which I express no opinion), they do not render the result in *Cosmopolitan Homes* consistent with the economic loss rule.

¶ 60 We cannot disregard *Cosmopolitan Homes*, particularly in light of the apparent affirmations of that decision in *Town of Alma* and *A.C. Excavating*. But perhaps it is time for the supreme court to take another look at the viability of the rule announced in that case in light of continued development of the law in Colorado and elsewhere.

---

**8.** Two other features of *Cosmopolitan Homes* are noteworthy. First, in a footnote, the majority dismissed out of hand any concern that only "economic loss" was at issue. *Cosmopolitan Homes*, 663 P.2d at 1051 n. 5. Subsequent cases have not been dismissive of such a fact. Second, Justice Rovira's dissent, though not mentioning the economic loss rule by name, was based on economic loss rule analysis. *Cosmopolitan Homes*, 663 P.2d at 1046–50.